IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| TERESA WINFUL, | ) | Civ. A. No. 2:13-2150-DCN-MGB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| THE MEDICAL UNIVERISTY OF | ) | |
| SOUTH CAROLINA, | ) | |
| | ) | |
| Defendant. | ) | |
| —————————————————— | ) | |

This matter is before the Court on Defendant Medical University of South Carolina's

Motion for Summary Judgment (Dkt. No. 45) pursuant to Federal Rule of Civil Procedure 56,

filed on September 30, 2014. The Plaintiff brought this case alleging that the Defendant, Medical

University of South Carolina ("MUSC"), violated her rights under Title VII of the Civil Rights

Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.;* in particular she alleges race and gender

discrimination and corresponding retaliation. (Dkt. No. 1.) The Plaintiff previously stipulated to

the dismissal of all other claims in her Complaint, including age discrimination, a claim under 42

U.S.C. §1983, a claim under 42 U.S.C. §1985, a hostile work environment claim, and claims

against two individual Defendants. (Dkt. Nos. 40, 44.) The Plaintiff filed a Response in

Opposition to Motion for Summary Judgment on November 21, 2014 (Dkt. No. 50)

("Opposition"), and the Defendant filed a Reply to Response to Motion in Opposition on

December 18, 2014 ("Reply"). (Dkt. No. 53.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(A), and

Local Rule 73.02(B)(2)(g), D.S.C., all pretrial matters in employment discrimination cases are

referred to a United States Magistrate Judge for consideration.

Having reviewed the parties' submissions and the applicable law, the undersigned recommends that the Defendant's Motion for Summary Judgment be granted in part and denied in part.

## I.  FACTUAL BACKGROUND

In December of 2006, the Plaintiff, an African-American female, was hired by MUSC as an Information Resources Consultant I in the Office of Financial Aid. She was hired by then supervisor Pearl Givens. (Dkt. No. 45-17, Plaintiff's Depo. p. 79.) Her responsibilities included general information technology and computer related tasks. (Dkt. No. 45-18, Ohlandt's Depo. p. 14-15, 24.) During this time, the Plaintiff began working with William Vandiver ("Vandiver"), a white male, so that she could take over his job responsibilities when he retired.  (Dkt. No. 45-17, Plaintiff's Depo. p. 62-63.)

Givens resigned her position in or around August 2008 and Plaintiff was under the supervision of George Ohlandt ("Ohlandt"). Ohlandt was hired as the Executive Director of Enrollment Management approximately one month before Givens resigned. Prior to supervising the Plaintiff, Ohlandt was on the interview committee that recommended the Plaintiff for hire in 2006. (Dkt. No. 45-18, Ohlandt's Depo. p. 14-16, 24, 29-30.) Defendant Cecile Kamath ("Kamath") was hired by MUSC in 2009 as Director of Financial Aid and became the Plaintiff's supervisor. Kamath was supervised by Ohlandt.  (Dkt. No. 45-18, Ohlandt Depo. p. 33, 36.) Dr. Darlene Shaw ("Shaw") was and is the Associate Provost for Educational Affairs and Student Life. She supervised the Office of Financial Aid at the time relevant to this case. (Dkt. No. 45-19, p. 15-17.)

The Plaintiff submitted her Employment Inquiry Questionnaire to the South Carolina Human Affairs Commission ("SCHAC") on February 22, 2011.  (Dkt. No. 45-17, Plaintiff's

Depo. p. 26-30; Dkt. No. 45-3, Questionnaire); the Plaintiff filed her Charge of Discrimination

("Charge") with SCHAC on May 9, 2011.  (Dkt. No. 45-4, Charge.)  In her Charge, Plaintiff

claimed discrimination based on race, gender, age and national origin, as well as retaliation.

SCHAC issued its Dismissal and Notice of Right to Sue Letter on April 24, 2013.  (Dkt. No. 45-

16, Dismissal and Right to Sue Letter.)  The letter to Plaintiff enclosing the Dismissal and Notice

is dated May 1, 2013. Id. The Plaintiff filed the Complaint on August 8, 2013 alleging, in

pertinent part, discrimination based on race, gender, and retaliation.  (Dkt. No. 1.)  The Plaintiff's

claims center around five basic areas of concern.

> A.    DENIAL OF RAISE

The Plaintiff claims that sometime in 2007, before her supervisor, Givens, resigned,

Givens promised the Plaintiff a 10% raise in pay as long as the Plaintiff  "took the system"

through the next six months. (Dkt. No. 45-17, Plaintiff's Depo. p. 73.) When the Plaintiff

approached Ohlandt about this raise in 2008, he asked her if it was "in writing". Id. On October

20, 2008, Ohlandt sent an e-mail to the Plaintiff indicating that he could not grant the raise

because "the budget situation is very tight." (Dkt. No. 45-14, Oct. 20, 2008 Email; Dkt. No. 45-

17, Plaintiff's Depo. pp. 174-175.)  The Plaintiff testified that Givens spoke to Human Resources

employee, Wendy Littlejohn ("Littlejohn"), about the raise.  (Dkt. No. 45-17, Plaintiff's Depo. p.

73.)  The Plaintiff did not include the issue of denial of the raise in her Charge.  (Dkt. No. 45-4,

Charge of Discrimination.)

> B.    DEMOTION IN AUGUST OF 2010

The Plaintiff's Charge claimed that she was demoted by MUSC on or about August 31,

2010 because of her race, her gender, her age (now dismissed) and retaliation for her opposition

to unlawful employment practices. (Dkt. No. 45-4.) The Plaintiff admits that her job title, compensation and benefits did not change. (Dkt. No. 45-17, Plaintiff's Depo. pp. 42-43.)

The evidence shows that beginning in January 2010, Ohlandt, Kamath and others were discussing potential changes in responsibilities within financial aid, including some of the Plaintiff's duties. (Dkt. No. 50-3, January 8, 2010 Ohlandt email; Dkt. No. 45-18, Ohlandt's Depo. p. 38-42.) Ohlandt stated that this was because the financial aid office was short-staffed and because the Plaintiff had expressed concerns that she had too much work to do. (Dkt. 45-18, Ohlandt's Depo. p. 41-42; Dkt. 45-17, Plaintiff's Depo. p. 71-72, 75).

The Plaintiff claims she was demoted on August 31, 2010 because of her gender, race and retaliation. (Dkt. No. 45-4.) The Plaintiff testified that in 2010 before her job duties changed, she complained to Littlejohn on numerous occasions to express specific concerns about work conditions at MUSC; and that in response, Littlejohn informed Plaintiff that if she continued to express her concerns, "someone would be fired." (Dkt. No. 45-17, Plaintiff's Depo. pp. 88-89, 183-84). Littlejohn has been described in the record as director of administration in Shaw's area, by Ohlandt (Dkt. No. 45-18, Ohlandt's Depo. p. 49), and by Plaintiff as the "HR person for our group." (Dkt. No. 45-17, Plaintiff's Depo. p. 73.)

Plaintiff asserts that the change in job duties constituted a demotion to a counselor position and alleges that the demotion is an adverse employment action. (Dkt. No. 45-17, Plaintiff's Depo. p. 32, 39.) This change in duties actually began before her alleged demotion, in about March of 2010, when another employee, Misty McKee (a white female) ("McKee"), was assigned the duties of external and internal report generating. (Dkt. No. 45-17, Plaintiff's Depo. p. 51-56; Dkt. No. 45-4, Charge p. 6.) The Plaintiff testified that "[a]ll of the meaty stuff I did as an IT person was removed." (Dkt. No. 45-17, Plaintiff's Depo. p. 43.) She kept some of her IT

duties. (Dkt. No. 45-17, Plaintiff's Depo. p. 43.) Various other duties were changed before, during and after her alleged demotion. (Dkt. No. 45-17, Plaintiff's Depo. p. 51-56.)[1] Some redistributed duties were performed by others: her co-employee, McKee, a white female; her supervisor, Ohlandt, a white male; Kamath, a mixed race female; and the eventual new hire for the job/promotion that is the subject of a separate claim of discrimination. (Ex. 45-17, Plaintiff's Deposition, pp. 49, 52, 54; Ex. 45-18, Ohlandt's Depo., pp. 35, 45, 47, and 51.)

Ohlandt testified that the Plaintiff's duties were reassigned because the Office of Financial Aid was short-staffed, he needed additional resources and the Plaintiff had expressed concern over time about her workload, that she had too much to do and was doing the job of multiple people. (Dkt. No. 45-18, Ohlandt's Depo. p. 41-42.) Ohlandt also testified that it is "standard operating procedure for us to regularly change job duties. It's … kind of an ongoing thing.  At least annually, people's job duties are examined and modified and tweaked and adjusted."  (Dkt. 45-18, Ohlandt's Depo. p. 46.)

C.    FAILURE TO PROMOTE – DECEMBER 2010

In or around December of 2010, a new position, Information Resources Consultant II, was created in the Office of Financial Aid. (Dkt. No. 45-18, Ohlandt's Depo. p. 91-92; Dkt. No. 45-17, Plaintiff's Depo. p. 60.)  This position was one pay band higher than the Plaintiff's current position.  (Dkt. No. 45-18, Ohlandt's Depo. p. 60.)  The Plaintiff alleges that on December 20, 2010, she was denied a promotion to that position.  (Dkt. 45-17, Plaintiff's Depo. p. 91; Dkt. No. 45-18, Ohlandt's Depo. p. 60.)

---

[1] Some of Plaintiff's duties were not totally taken away from her.  For instance, she was responsible for at least one report, the FISAP report, for at least one to two years after her alleged demotion. (Dkt. No. 45-17, Plaintiff's Depo. p. 56-58.)  She continued in the role as liaison with other departments until at least 2013.  (Dkt. No. 45-17, Plaintiff's Depo. p. 59-61.)  She continued to train employees after the alleged demotion. (Dkt. No. 45-17, Plaintiff's Depo. p. 63-65.)  She continued to review departmental budgets for some indefinite period of time after the alleged demotion.  (Dkt. No. 45-17, Plaintiff's Depo. p. 65-66.)

Out of forty-five (45) applicants, the Plaintiff was one of five (5) selected for an interview.  (Dkt. No. 45-18, Ohlandt's Depo. p. 64-65.)  The interview process consisted of a fifteen (15) minute practical test given to the candidates alone in a room, followed by a thirty (30) to forty (40) minute interview by a committee consisting of Ohlandt, Littlejohn, Kamath and a director from another division, Mark Allen.  (Dkt. No. 45-18, Ohlandt's Depo. p. 63-64.)  The committee then scored the candidates.  The committee's goal was to score the candidates and take those to Dr. Shaw for her decision.  (Dkt. No. 45-18, Ohlandt's Depo. p. 66.)

The Plaintiff received the lowest score, nineteen (19); another African-American woman received the highest score, forty-two (42); she was recommended by the committee, but she was not offered the position by Shaw because she only had an associate's degree. (Dkt. No. 45-18, Ohlandt's Depo. p. 66-68; Dkt. No. 45-9, Interview Score sheet.) McKee, the white female co-employee of the Plaintiff discussed *supra*, received a score of thirty-nine (39) and was offered the job first. McKee declined the position. (Dkt. No. 45-18, Ohlandt's Depo. p. 66-67, 69; Dkt. No. 45-9, Interview Score sheet.)  The job was filled by Evans Jenkins ("Jenkins"), a white male, who also received the highest score, forty-two (42).  (Dkt. No. 45-18, Ohlandt's Depo. p. 70-71; Dkt. No. 45-9, Interview Score sheet.)

At the time of the interview process, Ohlandt, Littlejohn and Kamath were aware of the Plaintiff's concerns and complaints about her workplace. Mark Allen ("Allen") stated in an affidavit that he was not aware of, or told about, any complaints by the Plaintiff about her working conditions at MUSC, including any complaints about discrimination. (Dkt. No. 45-8, Allen Affidavit.)

D.    <u>INVOLUNTARY TRANSFER – APRIL 25, 2013</u>

The Plaintiff was transferred to a new position in a new department outside of the Office of Financial Aid effective on or about April 25, 2013. (Dkt. No. 45-17, p. 162.)  Plaintiff was notified of the transfer on April 22, 2013, when she met with Shaw and her new supervisor, Dr. Mauldin, and she was given a copy of a letter memorializing the transfer. (Dkt. No. 45-17, Plaintiff's Depo. p. 162; Dkt. No. 50-15, Transfer Letter.) The Dismissal and Right to Sue form is dated April 24, 2013; the letter to Plaintiff enclosing it is dated May 1, 2013. The dismissal of the Charge by SCHAC is very close in time to the involuntary transfer, and approximately 23 months after the Charge was filed. (Dkt. 50-14, SCHAC Notice.)

After the Plaintiff did not receive the job as Information Resources Consultant II in December of 2010, the Plaintiff wrote MUSC's manager of human resources. In a letter dated December 31, 2010, the Plaintiff outlined her allegations of "retaliation, harassment and racial discrimination."  (Dkt. No. 50-12, Winful Dec. 2010 Correspondence.) In February of 2011, the Plaintiff filed her Employment Initial Inquiry Questionnaire with the SCHAC (Dkt. No. 45-3, SCHA questionnaire), and filed the Charge on or about May 9, 2011. (Dkt. No. 50-7, Charge.)

Between May of 2011 when the Charge was filed and the involuntary transfer in April of 2013, there is evidence in the record that the Plaintiff continued to complain about discriminatory treatment and that MUSC responded. In January of 2012, Kamath wrote a letter to the Plaintiff responding to Plaintiff's "emails from the past few months" about concerns about "having multiple priorities and some duties that are not IT in nature" and tried to adjust Plaintiff's duties in response to her complaints. (Dkt. No. 50-13, Kamath Jan. 2012 Correspondence.) The letter outlined management's reassessment of Plaintiff's duties.

In May of 2012, the Plaintiff was offered, first, a lateral transfer to a newly created position in a different department with no increase in pay. (Dkt. No. 45-17, Plaintiff's Depo. p. 158-159; Dkt. 45-10, Email and Attached Letter; Dkt. No. 45-19, Shaw Depo. pp. 62-63.) A few days later, the Plaintiff was approached again about the transfer and told it would come with a five percent (5%) pay increase. (Dkt. 45-19, Shaw Depo., p. 40-42.) The Plaintiff rejected the offer. (Id.) MUSC never filled that newly created position and never offered it to anyone else. (Dkt. No. 45-19, Shaw Depo., p. 63.)

In September of 2012, Ohlandt emailed the Plaintiff and offered to let her write her own job description, a step he called "unprecedented and unorthodox." Ohlandt testified he sent this because there had been ongoing conversations with the Plaintiff about her duties after Kamath left, and this was Ohlandt's attempt to get the Plaintiff to tell him what she wanted them to be; "she had expressed so many concerns over so long a period of time", that he was "desperate to find something she'd be content with." (Dkt. 45-6, Email from Ohlandt; Dkt. No. 45-18, Ohlandt's Depo., p. 91-93.) The Plaintiff responded by letter dated September 17, 2012, declining the offer to draft the job description with the limitations Ohlandt set forth in his email. She expressed that "I can easily see that my talents are being greatly minimized." (Dkt. No. 45-7, Winful letter dated Sept. 17, 2012.)

In letters dated October 11, 2012, and November 1, 2012, the Plaintiff wrote Shaw outlining her continued complaints of "unfair and unequal practices, retaliation measures and attempts to get rid of African American employees in the Financial Aid office", as well as other management problems in the Office of Financial Aid. (Dkt. No. 50-10, Oct. 11, 2012 Plaintiff Correspondence.) She identifies those employees whom MUSC was trying to get rid of as

herself; Mr. McDaniel ("McDaniel"), an African-American male; and Ms. Watson ("Watson"), an African-American female. Id.

The evidence shows that by February of 2013, MUSC was planning on transferring the Plaintiff out of the Office of Financial Aid. Dr. Shaw emailed a draft letter of transfer to the head of their EEOC unit, Wallace Bonaparte ("Bonaparte") and to others for their input.  (Dkt. No. 50-16 p. 2, Feb. 25, 2013 emails; Dkt. No. 45-19, Shaw Depo., p. 51-52.) Plaintiff was to be transferred to another department, Instructional Technology and Faculty Resources (ITFR) under Dr. Mary Mauldin.   Plaintiff's position was still to be an Information Resources Consultant I. (Dkt. No. 50-16 p. 3, Feb. 25, 2013 Shaw draft letter of transfer.) Bonaparte approved the letter and responded with advice and direction on how to handle the ultimate meeting with the Plaintiff: that Shaw should not bring up Plaintiff's complaints unless Plaintiff does; "be non-committal and make no promises"; and the meeting should be "just about the transfer, the organization's need for it and how it would benefit her."  (Dkt. No. 50-16 p. 2, Feb. 25 emails.)

On March 20, 2013, Shaw emailed Bonaparte and others: "Just want to let you know that I have not proceeded with the transfer, awaiting feedback from Wally [Bonaparte] about new info from SCHAS about witnesses for [Plaintiff]." (Dkt. No. 50-18 p. 2, March 20 email.) On April 22, 2013, approximately one month later, and very close in time to SCHAC's dismissal and right to sue letter, Shaw told Plaintiff that she would be transferred to a different office, Instructional Technology and Faculty Resources ("ITFR"), with a different supervisor. (Dkt. No. 45-17, Plaintiff's Depo. p. 162; Dkt. No. 50-15, Transfer Letter.)

E.     VARIOUS ALLEGATIONS OF DISPARATE TREATMENT

The Plaintiff also alleges that she was subjected to various instances of disparate treatment through February of 2011.

9

a.  Sick Leave

The Plaintiff alleged in her Charge that younger Caucasian staff members were allowed to go home or not come in when they were sick. (Dkt. No. 45-17, Plaintiff's Depo. pp. 123-124; Dkt. No. 45-4, Charge.) However, the Plaintiff has never been denied sick leave at MUSC. (Dkt. No. 45-17, Plaintiff's Depo. p. 125), and she cannot identify a time she came to work sick and was denied a request to leave work and go home. (Dkt. No. 45-17, Plaintiff's Depo. p. 128.) She does remember one or two occasions when she was sick at work and Dr. Kamath did not tell her spontaneously to go home.  (Dkt. No. 45-17, Plaintiff's Depo. p. 130-131.)

b.  Flexible Work Schedule

The Plaintiff alleged in her Charge that she was not allowed to work flex time by Dr. Kamath when an Asian-American staff member, Tami Cooke, was allowed to work such a schedule. (Dkt. No. 45-17, Plaintiff's Depo. p. 130; Dkt. No. 45-4, Charge.) The Plaintiff learned during the discovery phase of this case that Tami Cooke is actually an African-American female. (Dkt. No. 45-17, Plaintiff's Depo. p. 130.) The Plaintiff is unaware of any other employees in financial aid who were allowed flex time; she was generally aware of some employees in the records department who were allowed a flex schedule. (Dkt. No. 45-17, Plaintiff's Depo. p. 130-133.)

c.  Performance Review

The Plaintiff alleged in her Charge that she complained about her performance review rating to her supervisors and nothing was done; a white female (in a different job than Plaintiff ) complained and the rating for her next review a month or two later was changed. (Dkt. No. 45-17, Plaintiff's Depo. p. 134.) The Plaintiff's rating on that one occasion was "meets expectations" and she still received a raise. (Dkt. No. 45-17, Plaintiff's Depo. p. 136-138.) The

Plaintiff's subsequent evaluations were "exceeds expectations" or "substantially exceeds expectations." (Id.)

### d.    Attendance at Training Conferences

The Plaintiff alleged in her Charge that she was not allowed to attend important technical meetings and applicable training conferences. (Dkt. No. 45-4, Charge.) There was an annual Datatel training for IT staff that she was not allowed to attend for some years. (Dkt. No. 45-17, Plaintiff's Depo. p. 138.) She was allowed to attend the Datatel training once by Ohlandt; once by Dr. Shaw; one year no one attended because of budget constraints; and some years she did not go but Jenkins and other employees attended. (Id. at 138-139.) Employees other than Jenkins who were allowed to attend the Datatel training were Tami Cooke, an African-American female and two white females. (Dkt. No. 45-17, Plaintiff's Depo. p. 141-143.)

### e.    "Bashing" in Front of Coworkers

The Plaintiff alleged in her Charge that she was "bashed" by Ohlandt and Kamath in front of coworkers for things that were not her fault. (Dkt. No. 45-17, Plaintiff's Depo. p. 144.) Plaintiff cited two occasions with Kamath:  1)   A coworker told her that Kamath blamed Plaintiff when there was a problem with a report she generated; and 2)  Kamath told Plaintiff's colleagues during a staff meeting "not to send any emails to [Plaintiff]. ..".  (Dkt. No. 45-17, Plaintiff's Depo. p. 149-150.) The Plaintiff could not remember the details of the one occasion when Ohlandt allegedly "bashed" her in front of coworkers.  (Dkt. No. 45-17, Plaintiff's Depo. p. 150-151.)

## II.  SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED.

R. CIV. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing ... that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. See Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir.2002).

III.  DISCUSSION

A.  DENIAL OF RAISE

The Defendant argues that the Plaintiff's claim regarding the denial of a raise in October of 2008 is procedurally barred for two reasons:  1) because the Plaintiff did not file a charge of discrimination with the SCHAC within three hundred (300) days of the date she was informed of the denial by email from Ohlandt, October 20, 2008; and 2) her denial of a raise was not included in her Charge filed in May of 2011.  An individual alleging discrimination under Title VII must first file an administrative charge with the EEOC within a certain amount of time of the alleged unlawful act.  Pursuant to Title VII, the scope of claims the Plaintiff can pursue in this action is limited by the date she filed her Charge and the contents of the charge.  See Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995); Chacko v. Patuxent Institution, 429 F.3d 505, 508-509(4th Cir. 2005); Lewis v. Norfolk Southern Corp., 271 F.Supp.2d 807, 813(E.D.Va. 2003) (denial of a pay raise is a discrete discriminatory act). Plaintiff did not include the denial of a raise in her Charge, and therefore, she has not exhausted this claim. Whether this evidence will be admitted at trial as background evidence, as Plaintiff suggests, is a question for the trial court. (Dkt. No. 50, pp. 7-8.)

B.  AUGUST 2010 DEMOTION - DISCRIMINATION CLAIMS

1.    LEGAL STANDARD

Plaintiff asserts that she was discriminated against on account of her race and her gender in violation of Title VII, when she was subjected to discriminatory demotion, failure to promote and disparate treatment. See generally, Plaintiff's First and Second Causes of Action. (Dkt. No. 1.) Title VII makes it "an unlawful employment practice for an employer-(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin...."42 U.S.C. § 2000e–2(a)(1).

A plaintiff asserting a claim of unlawful employment discrimination may proceed

through two avenues of proof. First, using the direct method of proof, Plaintiff may establish

through direct or circumstantial evidence that a protected characteristic such as race was a

motivating factor in the employer's adverse decision. See Diamond v. Colonial Life & Acc. Ins.

Co., 416 F.3d 310, 318 (4th Cir.2005), cert. denied, 546 U.S. 1091 (2006); Hill v. Lockheed

Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–85 (4th Cir.2004) (en banc). Direct evidence is

defined as "evidence which demonstrates a 'specific link between the discriminatory animus and

the challenged decision, sufficient to support a finding by a reasonable fact-finder that an

illegitimate criterion actually motivated the challenged decision." Martin v Alumax of S.C., Inc.,

380 F.Supp.2d 723, 729 (D.S.C. 2005) (citations omitted) Direct evidence is "evidence of

conduct or statements that both reflect directly the alleged discriminatory attitude and that bear

directly on the contested employment decision." Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 520

(4th Cir.), cert. denied, 549 U.S. 812 (2006) (internal quotations omitted). Circumstantial

evidence must be of sufficient probative force to raise a genuine dispute of material fact. Evans

v. Technologies Applications & Service Co., 80 F.3d 954, 959 (4th Cir.1996); see also Burrows

v. Williamsburg Cnty., No. 4:13-CV-2464-RBH, 2015 WL 3967116, at *14 (D.S.C. June 30,

2015). [2]

---

[2] Plaintiff's claim could also be considered under the so-called "mixed-motive" analysis. See Hill v. Lockheed Martin, 354 F.3d 277, 284-285 (4th Cir. 2004); Mereish v. Walker, 359 F.3d 330, 339-340 (4th Cir. 2004); cf. Taylor v. Virginia Union Univ., 193 F.3d 219, 232 (4th Cir. 1999), cert. denied, 528 U.S. 1189 (2000) [en banc]. While Plaintiff cites to case law regarding the mixed-motive theory, as noted by the Defendant's Reply Brief, Plaintiff does not argue the mixed-motive theory. See Hopes v. Roche, Civ. A. No. 04-2963, 2005 WL 1812820 at * 6 n. 2 (D.Md. Aug. 2, 2005)(citing Nagy v. Baltimore Life Ins. Co., 49 F.Supp. 2d 822, 836 n. 13

The Plaintiff argues that she has established discrimination through the direct method by using a convincing "mosaic" of circumstantial evidence from which a reasonable jury could infer discriminatory intent. (Dkt. No. 50, p. 9-10.) Under this approach,

> [n]o single piece of evidence might amount to a smoking gun ... but the convincing mosaic approach allows a plaintiff to establish retaliation 'by assembling a number of pieces of evidence none meaningful in itself, consistent with the proposition of statistical theory that a number of observations each of which supports a proposition only weakly can, when taken as a whole, provide strong support if all point in the same direction....

Hobgood v. v. Ill. Gaming Bd., 731 F.3d 635, 647 (7th Cir. 2013); see also Cason v. S.C. State Ports Auth., 2:11–CV–2241–RMG, 2014 WL 588065, *4 (D.S.C. Feb.14, 2014) (citing Hobgood). Defendant notes that the "mosaic theory" has not been adopted by the Fourth Circuit, pointing to Giraldo v. City of Columbia, 47 F.Supp.3d 430 (D.S.C. 2014), in which the district court stated,

> [A]fter research, this Court can only find one case within the Fourth Circuit that cited and applied the mosaic theory, and it is the District of South Carolina case cited by Plaintiff. Nevertheless, this Court is not persuaded by the mosaic theory, or that application of the mosaic theory is binding. Further, Plaintiff has cited to no precedent establishing that the Fourth Circuit Court of Appeals has adopted the mosaic theory.

Id. at *2; see also Harrison v. S.C. Dep't of Mental Health, 47 F.Supp.3d 388, 392-393 (D.S.C. 2014).

> Perhaps stated differently, the law in this circuit provides that when evaluating whether the plaintiff has proffered sufficient circumstantial evidence to sustain her claims in the face of a summary judgment motion, the court should consider whether, as a whole, the plaintiff has 'presented probative circumstantial evidence to show that [the employer] acted with discriminatory animus.' Warch, 435 F.3d at 521; see also Hill, 354 F.3d at 286; Evans, 80 F.3d at 959. The court should consider the evidence as a whole rather than in isolation. See, e.g., Cook v. CSX Trans. Corp., 988 F.2d 507, 512 (4th Cir.1993) ("To focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn. The court notes that in both Hobgood and Cason the "convincing mosaic of circumstantial evidence" approach is used with respect to the but-

---

(D.Md. 1999)(Declining to engage in "mixed-motive" analysis where parties have not argued a mixed-motive theory.)).

for analysis necessary in retaliation cases. <u>Hobgood,</u> 731 F.3d at 643–44; <u>Cason</u>, 2014 WL 588065, *4.

<u>Burrows v. Williamsburg Cnty.</u>, No. 4:13-CV-2464-RBH, 2015 WL 3967116, at *15 n. 6 (D.S.C. June 30, 2015). Because the mosaic theory has not yet been adopted by the Fourth Circuit Court of Appeals, the undersigned will not apply it, but will analyze Plaintiff's claims under both the direct and indirect methods of proof.

## 2. DIRECT METHOD

Plaintiff argues that she can establish discrimination under the direct method of proof through the presentation of sufficient circumstantial evidence to show that the Defendant acted with discriminatory intent. (Dkt. No. 50, pp. 11-12.) Plaintiff highlights that she began raising discriminatory concerns prior to the August 2010 demotion.  When she raised these concerns with Littlejohn, a human resources employee, Littlejohn stated that if she continued to express her concerns, "someone would be fired." (Dkt. No. 45-17, Plaintiff's Depo. pp. 183-184.)[3]

Plaintiff asserts that in this same time period, Ohlandt, Kamath and others began to discuss potential changes within the Office of Financial Aid, including a change in Plaintiff's duties. To support this assertion, Plaintiff provided an email Ohlandt sent on January 8, 2010 discussing some of Plaintiff's duties and discussing adding "someone in [the other building] [who] can be involved in some other technical aspect of [Financial Aid] that is not done by [Plaintiff], but which others might assume was something [Plaintiff] did." (Dkt. No. 50-3, Jan. 8, 2010 Ohlandt email p. 2.) Plaintiff had no notice that her duties would be changed at the August 2010 meeting. (Dkt. No. 45-17, Plaintiff's Depo. pp. 38-39; Dkt. No. 45-18, Ohlandt's Depo. p. 55, 57.) Ohlandt sent an email dated August 30, 2010 to Kamath, Ohlandt congratulating Kamath on Plaintiff's revised job description. This email also stated that human resources had reviewed

---

[3] The undersigned notes that Plaintiff's employment has not been terminated and she remains in the same pay band. She continues to receive raises and good performance evaluations. (Dkt. No. 45-17, Plaintiff's Depo. p. 39-40.)

the changes and agreed that they would be an update only and would not "require any change in classification." (Dkt. No. 50-5.) Plaintiff also contends that Ohlandt made comments to employees to "look around the office because it will change."[4] (Dkt. No. 50-10, p. 2.)

First, Plaintiff has produced no evidence of gender discrimination in the August 2010 demotion. Plaintiff herself notes that Ohlandt had a practice of hiring females. (Dkt. No. 50, p. 11.) To the extent that other employees took over her duties, the reassignment was to males and females; McKee took over some duties (white female); Ohlandt took over some duties (white male); Kamath, Plaintiff's supervisor, took some duties (mixed race female); and Jenkins (a white male) eventually took over other duties. (Ex. 45-17, Plaintiff's Deposition, pp. 49, 52, 54; Ex. 45-18, Ohlandt's Depo. pp. 35, 45, 47, and 51.) Also during this time, McDaniels, an African-American male, was transferred out of Financial Aid. (Dkt. No. 45-18, Ohlandt's Depo. p. 47.) This circumstantial evidence does not support an inference of gender discrimination.

The change in job duties for several people around August of 2010, including Plaintiff, also undermines her contention that her "demotion" was race discrimination. Ohlandt testified that this type of adjustment of job duties was "not uncommon. In fact, it's probably standard operating procedure for us to regularly change job duties. It's … an ongoing thing. At least annually, employees' job duties are examined and modified and tweaked and adjusted." (Dkt. No. 45-18, Ohlandt's Depo. p. 46.) The Financial Aid office was short staffed and the Plaintiff had expressed her concerns repeatedly about her workload. (Dkt. No. 45-18, Ohlandt's Depo. p. 39.) Both men and women - white, African-American and mixed race - had their duties adjusted in this time period. This evidence fails to amount to circumstantial evidence sufficient to create

---

[4] Plaintiff references this in an October 11, 2012 letter to Shaw, but indicates that this was said to two other employees in Financial Aid, not to Plaintiff.  It is not clear in the record if Plaintiff has first-hand knowledge of this alleged statement by Ohlandt.

an inference under the direct method of proof that Plaintiff has been treated differently because of her race or her gender.

   3.   INDIRECT METHOD

If direct evidence is lacking, Plaintiff can proceed under the burden-shifting framework established in McDonnell Douglas v. Green, 411 U.S. 792, 802 (1973). To establish a *prima facie* case for discriminatory demotion, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for the job and her performance was satisfactory; (3) despite her qualifications, she was removed from her position and reassigned to a lower-level position, and (4) her original position "remained open" or was filled by a similarly qualified applicant outside of the protected class. Harris v. Home Sales Co., 499 F. App'x 285, 292 (4th Cir. 2012), (quoting Love–Lane v. Martin, 355 F.3d 766, 787 (4th Cir. 2004)). It is acknowledged that Plaintiff (1) is African American; and (2) was qualified for her job and her performance was satisfactory.  The parties dispute whether she was removed from her position and reassigned to a lower level. (Dkt. No. 45-1, p. 16.) They also dispute whether her original position remained open or was filled by a similarly qualified applicant outside the protected class. (Id. at 17.)

> [The Fourth Circuit] has set forth clearly what constitutes an adverse employment action. An adverse employment action is a discriminatory act which "adversely affect[s] 'the terms, conditions, or benefits' of the plaintiff's employment." Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir.2001) (quoting Munday v. Waste Mgmt. of North America, Inc., 126 F.3d 239, 243 (4th Cir.1997)).[5] "Conduct short of 'ultimate employment

---

[5] "Von Gunten entailed the interpretation of the anti-retaliation provision of Title VII, see 42 U.S.C. § 2000e-3, rather than the employment discrimination provision in 42 U.S.C. § 2000e-2 involved in this case. See Von Gunten, 243 F.3d at 863 n. 1. However, Von Gunten's discussion of what constitutes adverse action applies here as " '[i]n the absence of strong contrary policy considerations, conformity between the provisions of Title VII is to be preferred.' " Id. at 863 n. 1 (quoting Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985))." James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004)

decisions' can constitute adverse employment action." <u>Id</u>. The mere fact that a new job assignment is less appealing to the employee, however, does not constitute adverse employment action. <u>Von Gunten</u>, 243 F.3d at 868. A "reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect." <u>Boone v. Goldin</u>, 178 F.3d 253, 256 (4th Cir.1999). "[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." <u>Id</u>. at 256-57; <u>see also</u> <u>Taylor v. Virginia Dep't of Corrs.</u>, 177 F.Supp.2d 497, 504-05 (E.D.Va.2001).

<u>James v. Booz-Allen & Hamilton, Inc.</u>, 368 F.3d 371, 375-76 (4th Cir.), <u>cert. denied</u>, 543 U.S. 959 (2004).

The undersigned agrees with Defendant's argument that Plaintiff has not shown that she was demoted or assigned to a lower level position. Plaintiff admitted that she did not suffer any decrease in compensation, benefits, job title, or job classification. (Dkt. No. 45-17, pp. 39-40.) She remained in the Financial Aid office and had the same supervisor. (<u>Id</u>.) In fact, she continued to receive pay raises. The changes to her duties began before the August 2010 alleged "demotion" and continued after the announcement. She may have perceived them as lesser duties, but the job title, classification, and benefits remained the same.

While Plaintiff described at length in her deposition her various duties and approximately when they were modified or reassigned to others, she has not shown any *significant* detrimental effect to her. (Dkt. No. 45-17, Plaintiff's Depo. p. 43-62.) The allegation that she did not receive the promotion in December of 2010 is the subject of a different claim, *infra*, but the record is clear that she was considered for that promotion. Plaintiff's argument emphasizes the following allegations: 1) she did not receive prior notice; 2) Ohlandt and others discussed that the duty changes would not result in a change in pay bands; and 3) she never previously performed the duties of a financial aid counselor.  Even if these allegations are true, Plaintiff cannot deny that

she suffered no change in compensation, benefits, job title or classification and she has not

shown any significant detrimental effect to her.[6]

The undersigned also agrees with the Defendant that Plaintiff has not shown that her

original position "remained open" or was filled by a similarly qualified applicant outside of the

protected class. No one filled her exact position; she still retained the position of Information

Resources Consultant I. Plaintiff conflates two of her claims when she suggests that Jenkins

filled her position. The job he filled was a different position, with different requirements and

duties. (Dkt. No. 45-18, Ohlandt's Depo. p. 60, 73-74.) Plaintiff's positions are inconsistent

when she claims Jenkins took her position and also claims that the Defendant failed to promote

her. Plaintiff has not established a *prima facie* case of race or gender discrimination.[7]

## C. DEMOTION - RETALIATION

Plaintiff alleges that she was demoted in retaliation for her complaints from 2008 forward

about discriminatory treatment. Section 704(a) of Title VII, 42 U.S.C. § 2000(e)-3(a), which sets

forth the standard for a retaliation claim, provides as follows:

> It shall be an unlawful practice for an employer to discriminate against any of his
> employees or applicants for employment, for an employment agency, or joint labor-
> management committee controlling apprenticeship or other training or retraining,
> including on-the-job training programs, to discriminate against any individual, or for a
> labor organization to discriminate against any member thereof or applicants for
> membership, because he has opposed any practice made an unlawful employment
> practice by this subchapter, or because he has made a charge, testified, assisted, or
> participated in any manner in an investigation, proceeding, or hearing under this
> subchapter.

---

[6] In fact, since August of 2010, Plaintiff was in the top five candidates for a promotion to Information Resources Consultant II. (Dkt. No. 45-18, Ohlandt's Depo. pp. 64-65.) In May of 2012, MUSC offered Plaintiff a lateral transfer with a raise in salary. (Dkt. Nos. 45-10, 45-17, Plaintiff's Depo. pp. 158-159). Plaintiff has also received raises in pay consistently. (Dkt. No. 45-17, Plaintiff's Depo. p. 40.)

[7] Even if Plaintiff did establish a *prima facie* case, Defendant has provided a legitimate, non-discriminatory reason for the change in duties, the recent implementation of a conversion to a direct lending program, required by a recently passed federal law; this is in addition to the fact that Financial Aid was "short-staffed", and Plaintiff had complained of too much work to do. (Dkt. No. 45-19, Shaw Depo. pp. 19-20; Dkt. No. 45-18, Ohlandt's Depo. pp. 41-42.)

Retaliation cases are subject to the same requirements of proof that are applicable to disparate treatment claims. Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir. 1985), overruled on other grounds, Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); see also Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). The employee is initially required to establish a *prima facie* case of retaliation by a preponderance of the evidence. Such a *prima facie* case consists of three elements: (1) the employee engaged in protected activity; (2) the employer took adverse action against the employee; and (3) a causal connection existed between the protected activity and the adverse action. Id.; Munday v. Waste Management of North America, Inc., 126 F.3d 239, 242 (4th Cir. 1997), cert. denied, 522 U.S. 1116 (1998). If Plaintiff establishes a *prima facie* case, Defendant can rebut the presumption of retaliation by articulating a non-retaliatory reason for its actions. At that point, Plaintiff must present evidence sufficient to create a genuine issue of material fact that Defendant's legitimate, non-retaliatory reason is pretextual. See Matvia v. Bald Head Island Management, 259 F.3d 261, 271 (4th Cir. 2001); Burrows v. Williamsburg Cnty., 2015 WL 3967116 at *18.

1.     DIRECT METHOD

Analyzing the retaliation claim under the direct method of proof, Plaintiff does not contend that there is direct evidence of retaliation, but that there is sufficient circumstantial evidence of retaliation without resorting to the burden-shifting framework. (Dkt. No. 50-1, p. 15.) Plaintiff directs the undersigned to her Opposition section regarding circumstantial evidence of race discrimination. Plaintiff's argument for retaliation fails for the same reasons the undersigned did not find sufficient evidence to create a genuine issue of material fact on the race and gender discrimination claims, *supra*. There is no evidence of gender discrimination; there

was no adverse action; and there was no evidence of a causal connection between the protected activity and the adverse action.

The undersigned has considered two of Plaintiff's exhibits, the January 8, 2010 Ohlandt email (Dkt. No. 50-3) and the August 30, 2010 email (Dkt. No. 50-5), both regarding Plaintiff's duties. Even taking the exhibits in the light most favorable to Plaintiff, they do not establish circumstantial evidence of retaliation.

In the January 8 email, Ohlandt is asking Kamath and two employees from human resources about more personnel for the Financial Aid office. The email describes some of Plaintiff's duties and asks if there is some way "someone … can be involved in some other technical aspect of FA that is not done by [Plaintiff]" and can "think of a couple of ways there can be more involvement in non-technical work between buildings, particularly by the two (hopefully) new records folks. …. These will at least show we are not closed to collaboration, just to those two positions being used as [Plaintiff] stand-ins." The substance of the email is consistent with Ohlandt's testimony that financial aid was short-staffed and Plaintiff had said she was overworked. (Dkt. No. 45-18, Ohlandt's Depo. pp. 41-42.)

The undersigned has also considered Plaintiff's exhibit 5, Ohlandt's email to Kamath, Shaw and Littlejohn telling Kamath that she did a good job writing the revised job description for Plaintiff and stating that human resources has reviewed the changes and the new job description did not require any change to classification. (Dkt. No. 50-5.) The undersigned sees no sinister inference from this email; Plaintiff was assured that this was not a demotion because the restructured duties had been reviewed thoroughly. Plaintiff has not established retaliation through this circumstantial evidence. The analysis must now turn to the McDonnell-Douglas burden-shifting framework.

2.     INDIRECT METHOD

Plaintiff cannot establish a *prima facie* case of retaliation because she cannot establish that her change in duties constituted an adverse employment action. "The anti-retaliation provision of Title VII does not remedy everything that makes an employee unhappy." Smith v. Vilsack, 832 F.Supp.2d 573, 583 (D.Md. 2011) (quoting Jeffers v. Thompson, 264 F.Supp.2d 314, 329 (D.Md. 2003)). As discussed *supra*, Plaintiff has not shown that her change of duties was a demotion.  See II.B.

Plaintiff also cannot show a causal connection or "but for" causation. At that time in her employment, August of 2010, Plaintiff had only made internal complaints to employees of MUSC.  Her SCHA questionnaire was not until February of 2011 and her Charge of Discrimination was filed in May of 2011.  Her protected activity at that time is her ongoing oral complaints since 2008. Plaintiff provided three exhibits with her written letters of complaint to Kamath, Shaw and others, but they are all dated after the August 2010 alleged "demotion." Plaintiff has not proven that ongoing oral complaints dating over a two year period were causally connected to an alleged demotion in August of 2010. Kenfield v. Colorado Dep't of Public Health & Environment, 557 F. App'x. 728 (10th Cir. 2014) ["By its very nature, retaliatory conduct must come *after* the protected activity."].  There is nothing in Plaintiff's documents from which an inference can be drawn that the way Defendant changed Plaintiff's duties was due to a retaliatory animus on the part of the Defendant, or anyone else, because of Plaintiff's oral complaints for a two year period of time. Univ. of Texas Southwestern Medical Center v. Nassar, _U.S._, 133 S.Ct. 2517, 2533–534 (2013) ("a plaintiff making a [Title VII] retaliation claim ... must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

Plaintiff's own subjective feelings and conclusory statements are likewise not enough to show a genuine issue of material fact. Cecilino v. Allstate Ins. Co., 908 F.Supp. 519, 532 (N.D.Ill.1995) (a simple showing that an adverse action occurred after a complaint of discrimination "is not even enough to make out a prima facie case of retaliation, let alone to survive a motion for summary judgment."); Rucker v. Greenville Co. Sheriff Dep't., Civ. A. No. 10–1533, 2012 WL 951789, * 2 (D.S.C. Mar. 20, 2012) (Conclusory allegation or denials, without more, are insufficient to preclude the granting of a summary judgment motion.); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) (Plaintiff may not "create a genuine issue of fact through mere speculation or the building of one inference upon another"); Gairola v. Va. Dep't of Gen. Servs., 753 F.2d 1281, 1288, n. 4 (4th Cir.1985) (a case should be dismissed "... when the only evidence in support of the plaintiff's ... case is based on unfounded conjecture ... that her disfavorable treatment was the result of discrimination...."); Rucker, 2012 WL 951789 *2 (Conclusory allegation or denials, without more, are insufficient to preclude the granting of a summary judgment motion); Sutton v. Vilsack, No. 2:12-CV-01386-DCN, 2014 WL 4199163, at *11 (D.S.C. Aug. 20, 2014) (plaintiff's own speculation and subjective belief that retaliation has occurred is not sufficient to raise a reasonable inference of unlawful discrimination.) (citing Boden v. U.S. Amada Ltd., 978 F.Supp. 657, 659 (E.D.N.C. 1997); "[T]he scope of review in employment discrimination cases is more narrow than [Plaintiff] wishes because federal courts are not review boards for local employment decisions…. A personnel decision can by silly, it can be unfair, and it can be short-sighted without being illegal." Hairsine v. James, 517 F.Supp.2d 301, 308-309 (D.D.C. 2007). The undersigned recommends that summary judgment be granted to the demotion discrimination and demotion retaliation claims.

### D.  FAILURE TO PROMOTE – DISCRIMINATION CLAIMS

Plaintiff alleges that the Defendant failed to promote her to Information Resources Consultant II in November of 2010 because of her race and gender. The Plaintiff can proceed under the direct method of proof, whether there is sufficient direct or circumstantial evidence to show discriminatory animus, or under the indirect method using the burden-shifting framework of McDonnell-Douglas.

### 1.    DIRECT METHOD

Plaintiff claims she can establish sufficient circumstantial evidence from which a reasonable jury could infer discriminatory intent on her failure to promote claim.  She claims that the new position encapsulated her job duties prior to her demotion. She claims this assertion is supported by the fact that she had to train the new employee ultimately hired, Jenkins. (Dkt. No. 45-18, Ohlandt's Depo. p. 74-75.) But Plaintiff was not the only Financial Aid employee who trained Jenkins; he trained with everyone within Financial Aid because he was charged with innovating, changing and modifying processes within the Financial Aid office. (Id.) He did take over the survey writing that Plaintiff had at one time done, and which McKee took over before the August 2010 alleged "demotion", but that is a far cry from saying that the new position encapsulated all her duties prior to August 2010.

Plaintiff supports her argument of discrimination with the fact that the interviewing committee consisted of Ohlandt, Kamath, Littlejohn and Mark Allen, a director from another division. Plaintiff makes much of the fact that three of the committee members (Ohlandt, Kamath and Littlejohn) were already biased against her because she had complained to each of them before of discriminatory treatment. Plaintiff ignores the affidavit of Mark Allen, which states that he did not know that Plaintiff had made complaints or expressed concerns at all over her working

conditions, including discrimination, and was not told of such by any other committee member at any time before, during or after the committee completed its work. (Dkt. No. 45-8, Affidavit of Mark Allen, p. 2.)

Plaintiff also alleges that her low score on the interview process was suspicious because of the biased committee. (Dkt. No. 50, p. 19-20.) This inference ignores that Mark Allen had no reason to be biased against Plaintiff and also scored Plaintiff in the low range. Also, the fact that the committee recommended an African-American female (whom Shaw did not hire because of a lack of a bachelor's degree), belies any inference of race or gender discrimination.  The fact that the second choice was McKee, a female, also belies any inference of gender discrimination. Plaintiff has no direct evidence of gender or race discrimination, and has insufficient circumstantial evidence that she was the victim of discrimination in the failure to promote her.

Plaintiff also attempts to rely on the fact that a white male got the job as evidence of gender and race discrimination, and the fact that McKee, a white female, was offered the job as evidence of race discrimination. Plaintiff ignores other testimony in the record that the committee of four who interviewed her recommended to Shaw, the final decision maker, an African-American female for the position.

Defendant has also offered a legitimate, non-discriminatory reason for the decision not to give Plaintiff the Information Resources Consultant II position.  As explained in detail *supra*, Plaintiff was not as qualified as other applicants.  Her conclusory claim that she was the most qualified is not born out by the record. See McCormack v. Boeing Co., No. 2:12-cv-3089-DCN, 2014 WL 1318928 * 6 (D.S.C. Mar. 31, 2014) ("It is the perception of the decision-maker which is relevant, not the self-assessment of the plaintiff) (citations omitted); Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 272 (4th Cir. 2005), cert. denied, 546 U.S.

1214 (2006) (courts "do not sit as a 'super-personnel department' weighing the prudence of employment decisions.").

2.   <u>INDIRECT METHOD</u>

Under the <u>McDonnell-Douglas</u> framework in a failure to promote context, the *prima facie* case requires the Plaintiff to show: 1) she is a member of a protected class; 2) her employer had an open position for which she applied or sought to apply; 3) she was qualified for the position; and 4) she was rejected under circumstances giving rise to an inference of unlawful discrimination. <u>Evans v. Technologies Applications & Service Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996); <u>see also</u> <u>Anderson v. Westinghouse Savannah River Co.</u>, 406 F.3d at 268; <u>Harrison v. S. C. Dept. of Mental Health</u>, 47 F.Supp.3d 388, 399 (D.S.C. 2014), <u>vacated and remanded on other grounds</u>, 2015 WL 4081226 (4th Cir. 2015).[8] Defendant argues that Plaintiff has not shown that the Defendant rejected her for the job under circumstances that give rise to an inference of unlawful discrimination. (Dkt. No. 45-1, p. 24-25.)

Plaintiff again argues that the committee's scores were biased because of the committee's prior knowledge of Plaintiff's complaints of discriminatory treatment. Plaintiff states in a conclusory fashion that "there is no reason to not believe the committee members discussed the candidates and that Allen was on notice of the negative impressions of the other committee members." (Dkt. No. 50, p. 21.) This statement is conclusory and not supported by the record, specifically Mark Allen's affidavit. (Dkt. No. 45-8.) This argument also is undermined by other evidence in the record; the interview score sheet and comments explain Plaintiff's low scores without any reference, direct or indirect, to her prior complaints of discriminatory treatment. (Dkt. No. 45-9.)

---

[8] There is no dispute that: 1) Plaintiff is a member of a protected class; 2) there was an open position; and 3) Plaintiff was qualified for the job.

Plaintiff again claims that she alone trained Jenkins, and that this is evidence that the new position was similar to Plaintiff's prior position. She goes on to state that "Ohlandt even admitted that Jenkins later took over all of Plaintiff's prior job duties." (Dkt. No. 50, p. 21). This is not correct: Ohlandt specifically denied that the new job was similar to Plaintiff's position. (Dkt. No. 45-18, Ohlandt's Depo. p. 73.) Ohlandt explained that the new position had a very different purpose. Ohlandt explained that the

> purpose of this position was to innovate, be creative, change processes that were already in existence, make improvements, revamp the system, and take full advantage of available resources; whereas the position that [Plaintiff] at the time occupied was more of one of executing preexisting processes. If I can use an analogy, it would be a difference between a cook and a chef. A cook's job is to efficiently follow a recipe and do the assigned dishes as quickly and as consistently as possible; whereas, a chef's job is to come up with new dishes and tweak and adjust and play and experiment with those dishes. So that's the comparison between the two positions.

 (Dkt. No. 45-18, Ohlandt's Depo. p. 73-74.)

Plaintiff again ignores that the committee she claims has engaged in race and gender discrimination recommended an African-American female for the position, negating any inference of race or gender discrimination. The undersigned recommends granting summary judgment to Defendant on Plaintiff's race and gender discrimination claims in the failure to promote context.

### E.  RETALIATION – FAILURE TO PROMOTE

Plaintiff also claims that the Defendant rejected her for the new position in retaliation for her past complaints. Defendant counters that Plaintiff cannot establish a *prima facie* case of retaliation in the failure to promote context because she cannot prove a causal connection and/or "but-for causation."[9]

---

[9] Plaintiff does not argue that she can show retaliation under the direct method of proof. The elements of a *prima facie* retaliation claim under the McDonnell-Douglas framework are: 1) Plaintiff engaged in a protected activity; 2)

Plaintiff's outline of the series of events is as follows. Plaintiff had been complaining of discriminatory treatment throughout her employ, from some time in 2008 past her alleged demotion in August 2010. Three of the four committee members, Ohlandt, Kamath and Littlejohn, were all knowledgeable of her ongoing concerns and had been involved in her alleged "demotion" which was imposed on her a few months before the Information Resources II position came open. Her low score in the interview process was "ripe with bias." She was not told about the test contents in advance; she was provided no details on how she performed on the practice test itself; Defendant has shown little to no evidence that Plaintiff performed badly on the test; Plaintiff believes that Jenkins did not have to take the first test, but took it after his second interview; and Jenkins told Plaintiff that he did not do well on the test. (Dkt. No. 50, p. 23 and Dkt. No. 45-17, Plaintiff's Depo. p. 99-101.) Plaintiff argues that this evidence is sufficient to submit to a jury regarding retaliatory animus to prove that there was a causal connection between the protected activity and the failure to promote.

The undersigned disagrees. The undersigned has explained *supra* why there is no evidence, and only speculation, about bias in the committee and the scoring results. There is similarly no other evidence of retaliatory animus, but only speculation. Plaintiff was one of forty-five (45) applicants, five (5) of whom were selected for an interview. (Dkt. No. 45-18, Ohlandt's Depo. pp. 64-65.) She was given the same test as the others, even if Jenkins took it later than she did. She had an interview like the other five candidates. She scored lower than the other applicants, and Mark Allen's score for Plaintiff was consistent with the other committee

---

her employer acted adversely against her; and 3) there was a causal connection between the asserted adverse action and the protected activity. Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008); Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007.) Title VII retaliation claims also require proof that the desire to retaliate was the but-for cause of the challenged employment action. Univ. of Texas Southwestern Medical Center v. Nassar, 133 S.Ct. 2517, 2528 (2013). The only elements at issue here are causal connection and but-for causation.

members. (Dkt. No. 45-9.) Mark Allen had no prior knowledge of Plaintiff's complaints.

Plaintiff has not provided evidence of a causal connection or but-for causation.

### F.  INVOLUNTARY TRANSFER

#### 1.  FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Defendant asserts that Plaintiff has failed to exhaust her administrative remedies on the

discrimination and retaliation claims in the context of the involuntary transfer. There is a general

exhaustion requirement in Title VII cases:

> Before filing suit under Title VII, however, "a plaintiff must exhaust her administrative
> remedies by bringing a charge with the EEOC." Smith v. First Union Nat'l Bank, 202
> F.3d 234, 247 (4th Cir. 2000); see also 42 U.S.C. § 2000e–5(f)(1). Exhausting the
> administrative remedies is a statutory prerequisite to invoking the jurisdiction of this
> court. Jones v. Calvert Group, Ltd., 551 F.3d 297, 300 (4th Cir. 2009) ("[A] failure by the
> plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the
> federal courts of subject matter jurisdiction over the claim."). The reasons for
> administrative remedies have been summarized as follows:

>> "In enacting Title VII, Congress created an agency under whose jurisdiction there
>> would be an opportunity for the parties to resolve employment issues without
>> public litigation. The intent was that, by avoiding publicity, employees might be
>> spared embarrassment, and employers might be more willing to adjust their
>> employment practices if they were not subjected to the glare of public accusation
>> and recrimination. Congress ... made it a condition precedent to the public
>> litigation of those claims that an employee must first seek administrative relief
>> through the EEOC.... The purposes underlying the administrative charge
>> requirement include giving the charged party notice of the claim, narrowing the
>> issues for speedier and more effective adjudication and decision, and giving the
>> EEOC and the employer an opportunity to resolve the dispute. If the EEOC finds
>> reasonable cause to believe that a violation has occurred it must attempt to
>> eliminate the practice through conciliation, conference, and persuasion before
>> commencing a lawsuit."

Tonkin v. Shadow Mgmt., Inc., No. 3:12-CV-00198-JFA, 2014 WL 4063626, at *3 (D.S.C. Aug.

14, 2014) aff'd, 605 F. App'x 194 (4th Cir. 2015) (citation omitted); see also, Chacko v. Patuxent

Inst., 429 F.3d 505, 510 (4th Cir. 2005).

In considering exhaustion of administrative remedies, the emphasis is on whether a claim in encompassed in the charge:

> To determine if a claim is encompassed in the charge so as to be maintained in a subsequent Title VII lawsuit, a court may consider "[o]nly those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint." Id. (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir.1996)). This inquiry attempts to strike a "balance between providing notice to employers and the EEOC on the one hand and ensuring plaintiffs are not tripped up over technicalities on the other." Sydnor v. Fairfax Cnty., Va., 681 F.3d 591, 594 (4th Cir.2012).

Tonkin v. Shadow Mgmt., Inc., 2014 WL 4063626, at *4.

The Dismissal and Notice of Right to Sue from SCHAC was dated April 24, 2013; the SCHAC letter to Plaintiff enclosing the Dismissal and Notice was dated May 1, 2013. (Dkt. No. 50-14, pp. 2-3.) Plaintiff filed the Charge on or about May 9, 2011. Plaintiff's involuntary transfer was on April 22, 2013. (Dkt. No. 45-15.) Defendant argues that Plaintiff did not exhaust her administrative remedies on the involuntary transfer claim because she did not file a second subsequent complaint with the SCHAC following the transfer. Plaintiff could not have included the discrimination and retaliation claims in the context of the involuntary transfer in her first submission because the Charge pre-dated the event, or put another way, Plaintiff filed her Charge before she was involuntarily transferred.

It appears undisputed that Plaintiff did not file a second administrative charge of discrimination with the SCHAC based on the involuntary transfer. The question is then whether Plaintiff's claims in her judicial Complaint "are reasonably related to her EEOC charge and can be expected to follow from a reasonable investigation." Sydnor v. Fairfax Cnty., Va., 681 F.3d 591, 594 (4th Cir. 2012) (citing Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000)).

Under Fourth Circuit precedent, Plaintiff does not have to exhaust administrative remedies on the retaliation claim.  Plaintiff may raise a retaliation claim for the first time in federal district court. See Hentosh v. Old Dominion Univ., 767 F.3d 413, 415-416 (4th Cir. 2014); Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992) (This exception to the exhaustion requirement is "the inevitable corollary of our generally accepted principle" that the district court has jurisdiction over those claims "reasonably related to" the allegations in the administrative charge.").

The question of whether the Title VII race and gender discrimination claims have to be exhausted is a closer question. The Supreme Court has found that "[d]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges", and "each discrete discriminatory act starts a new clock for filing charges alleging that act." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002). The Court has stated that certain adverse employment practices such as the failure to promote, termination, denial of transfer or refusal to hire are such discrete acts. Id. at 110. "[E]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice. Id. at 114. See also, Johnson v. Portfolio Recovery Associates, LLC, 682 F.Supp.2d 560, 584 (E.D. Va. 2009).

In this case, in the Charge, Plaintiff complained of various acts of discrimination, including the August 2010 demotion, the December 2010 failure to promote, as well as various claims of disparate treatment, discussed infra. Plaintiff checked the box for "continuing action". Plaintiff's theory of the case is that she was the subject of continuing discrimination and retaliation by Defendant, resulting first in a demotion, and then a failure to promote her. The next step taken by Defendant, after the SCHAC investigation was underway, was an involuntary

transfer to another department, almost identical in time to the SCHAC decision to dismiss the Charge. The involuntary transfer was after Plaintiff filed her SCHAC complaint. The undersigned finds that the involuntary transfer is reasonably related to the Charge in the administrative action. To find otherwise would require Plaintiff to file yet another administrative charge right after the first one had been dismissed. The second investigation would be ongoing while Plaintiff had to proceed to litigation on the first administrative Charge. See Tonkin, 2014 WL 4063626 at *5 (Plaintiff's claim was barred because the discrete protected activity and discrete adverse action occurred before Plaintiff filed her EEOC charge.) Here, the involuntary transfer was after Plaintiff filed her Charge. The involuntary transfer involved many of the same people, such as Ohlandt, Shaw and Littlejohn. There was continuing alleged discriminatory and retaliatory conduct. Defendant was on fair notice that Plaintiff was claiming discrimination and retaliation in MUSC's ongoing efforts to adversely affect her employment. The undersigned recommends concluding that Plaintiff's race and gender discrimination claims in the context of the involuntary transfer are not barred for failure to exhaust.

## 2. DIRECT METHOD

Plaintiff contends that she has provided sufficient direct and circumstantial evidence from which a reasonable jury could infer discriminatory intent. (Dkt. No. 50, p. 25-26.) Plaintiff highlights various pieces of circumstantial evidence. Plaintiff highlights that after she did not get the promotion, she continued her complaints to and about Defendant, including filing her Charge of Discrimination with SCHAC in May of 2011. (Dkt. No. 50-7.) Defendant also received another employee's internal complaint of discrimination in the Financial Aid office. (Dkt. No. 50-17, letter from employee Watson dated December 5, 2011.) Defendant offered Plaintiff a similar job in another department approximately one year after she filed her Charge in May of

2012 with a raise (Dkt. No. 45-17, Plaintiff's Depo. p. 158-159; Dkt. No. 45-19, Shaw's Depo. pp.40-41), but Plaintiff declined the offer. (Dkt. No. 50-9, Plaintiff's letter rejecting offer dated May 14, 2012.) Plaintiff claims the offer was part of the discriminatory chain of events because the position Defendant offered her was never filled. (Dkt. No. 45-19, Shaw's Depo. pp. 62-63.) Shaw explained that it was a newly created position that they never found the resources to fill. Id. Defendant then began thinking of transferring Plaintiff to another department, evidenced by Shaw's email exchange and Shaw's draft letter to Plaintiff dated February 25, 2013. The draft letter is essentially the same as the actual transfer letter of April 22, 2013. Shaw emailed the draft letter to several people, including Bonaparte, head of Defendant's EEOC office and Littlejohn, both of whom were aware of Plaintiff's history of complaints.

The email exchange stated that a human resources person wrote the letter incorporating Bonaparte's suggestions.  February 25, 2013 is before the SCHAC issued its decision. Bonaparte cautioned Shaw not to bring up Plaintiff's complaints unless Plaintiff does, and then be non-committal and "make no promises. This meeting should be strictly about the transfer…." (Dkt. No. 50-16, pp. 2-3.) Shaw emailed Bonaparte and others on March 20, 2013, stating that she "ha[s] not proceeded with the transfer, awaiting feedback from Wally (Bonaparte) about new info from SCHAC about witnesses for [Plaintiff]." SCHAC issued its Dismissal and Notice of Right to Sue on April 24, 2013. (Dkt. No. 50-14.) Plaintiff's official transfer letter from Shaw is dated April 22, 2013. (Dkt. No. 50-15.)

This chain of events does not provide Plaintiff with an inference of race and gender discrimination. There is no evidence that Plaintiff was adversely affected because she was

African-American and/or female.[10] It does however, establish a genuine issue of material fact as to whether the involuntary transfer was in retaliation for Plaintiff's protected activity, the filing of her Charge of discrimination.[11] These facts may be considered by a jury as direct evidence of retaliation and establish a genuine issue of material fact concerning a causal connection and but-for causation. The undersigned recommends that summary judgment be granted as to Plaintiff's discrimination claims in the context of the involuntary transfer. The undersigned recommends that summary judgment be denied as to Plaintiff's retaliation claim in the context of the involuntary transfer because she has provided direct evidence of retaliation.

### 3. INDIRECT METHOD

Even if the District Court does not find that there is a genuine issue of material fact under the direct method of proof, the undersigned recommends that Plaintiff has established a *prima facie* case of retaliation in the context of the involuntary transfer. [12] Unlike the alleged "demotion" resulting in a change of duties in the Financial Aid Office, the involuntary transfer was to an entirely different department with a different purpose from the Financial Aid office even though in the same pay band. Plaintiff has a new supervisor and apparently new duties. (See Dkt. No. 50-15 outlining Plaintiff's possible duties.) Plaintiff is basically starting over again to prove herself in a new department and therefore, a jury could find there was an effect on her opportunity to get promotions. See Boone v. Goldin, 178 F.3d at 256-257 (4th Cir. 1999). There is also a genuine issue of material fact as to causation and but-for causation based on the facts cited *supra*. Defendant has not refuted the *prima facie* case for purposes of summary judgment in

---

[10] Plaintiff herself identified a male, Jerome Daniels, as being transferred by Defendant out of the Financial Aid office during her tenure there. She also identified McKee, a white female, as someone whose duties were transferred.

[11] Defendant claims that no reasonable jury could conclude that Shaw would wait almost two years after the filing of the Charge to retaliate against Plaintiff. (Dkt. No. 53 p. 15.) This ignores the fact of the timing of the transfer. A reasonable jury could conclude that Shaw waited to transfer Plaintiff until she knew that the SCHAC had decided to dismiss Plaintiff's administrative charge.

[12] See footnote 7 *infra* for the elements of a *prima facie* case of retaliation.

the involuntary transfer context. A reasonable jury could find that Defendant's proffered non-retaliatory reason - a longstanding need in another department - could be a pretext to finally rid the Financial Aid office of Plaintiff.  The chain of events leading to the involuntary transfer, including Shaw's own emails, create a genuine issue of material fact on the issue of pretext.

### G.  VARIOUS CLAIMS OF DISPARATE TREATMENT

Plaintiff alleges various claims of disparate treatment.  Those claims include Defendant's denial of sick leave; rejection of flexible work schedule; refusal to modify one performance review; refusal to allow Plaintiff to attend various training conferences; and bashing in front of co-workers. (Dkt. No. 45-17, Plaintiff's Depo. pp. 123-138.) Defendant refutes these claims factually. Plaintiff admitted in her deposition that she was never denied sick leave. Instead, her claim is that when white colleagues are sick, they are immediately sent home; when she is sick, she is questioned. She could not recall a time when she was told she could not leave work when she was sick. (Dkt. No. 45-17, Plaintiff's Depo. p. 128.)

Plaintiff complained that another employee, Tami Cooke, was allowed to work a flex schedule when she was not.  However, Tami Cooke is an African-American female whom Plaintiff mistakenly thought to be Asian-American. (Dkt. No. 45-17, Plaintiff's Depo. p. 130.) Some other white female employees in the records department were also allowed to work flex hours. (Id. at 132-133.) This does not establish evidence of race or gender discrimination.

Plaintiff alleges that on one occasion, she complained about her performance rating to no avail, but when a white female employee complained about her performance rating, it was changed. (Dkt. No. 45-17, Plaintiff's Depo. p. 134.)

Plaintiff complained that she was not allowed to attend applicable training conferences when others did. One such person was Jenkins, the white male who got the job Plaintiff

described as the "promotion." In her deposition, Plaintiff admitted that she did attend one particular training conference of importance to her for several years, just not every year. Tami Cooke, an African-American female also got to go when she did not. White females and African-American females, as well as a white male, got to go to this conference at times. (Dkt. No. 45-17, Plaintiff's Depo. p. 141-143.) There is no evidence that the years Plaintiff was not allowed to go to the conference was because of her race or gender. When pressed during her deposition testimony, she detailed two specific instances where Kamath "bashed her" in front of others but she could not remember any specific instances of "bashing" by Ohlandt. Id.

In the disparate treatment context, the types of allegations Plaintiff makes do not constitute an adverse employment action. Complaints such as "charges of time abuse, reassignment of location of office, opposition to hiring Plaintiff's relative, discontinuing a training conference…, excluding Plaintiff from a conference and decision to hire outside consultant, do not constitute adverse employment actions." Cunningham v. New York State Dep't of Labor, 326 F.App'x. 617, 619 (2d Cir. 2009); see also Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 485 (5th Cir. 2008) (finding negative treatment, undesired break schedule, and assignment of more arduous and dirty jobs are not adverse actions.) To the extent that Plaintiff's complaints of disparate treatment have not been found factually incorrect, they do not constitute actionable claims of discrimination.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the undersigned recommends that Defendant's motion for summary judgment (Dkt. No. 45) be **GRANTED** in part and **DENIED** in part. Specifically it is recommended that summary judgment be **GRANTED** as to Plaintiff's Title VII claims for race and gender discrimination, the First and Second Causes of Action. The undersigned recommends that summary judgment be **DENIED** as to Plaintiff's claim for retaliation, the Sixth Cause of Action.

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

August 5, 2015
Charleston, South Carolina

**The parties' attention is directed towards the important notice on the next page.**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).